STEVEN G. KALAR
Federal Public Defender
Northern District of California
CANDIS MITCHELL
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:  (415) 436-7700
Facsimile:   (415) 436-7706
Email:        Candis_Mitchell@fd.org

Counsel for Defendant Estrada

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **United States of America**, | Case No.: CR 19–546 CRB |
| Plaintiff, | **Sentencing Memorandum** |
| v. | Court:          Courtroom 2, 17th Floor |
| **Arnulfo Estrada,** | Hearing Date:  March 25, 2020 |
| Defendant. | Hearing Time:  10:00 a.m. |

INTRODUCTION

Defendant Arnulfo Estrada, through undersigned counsel, respectfully offers the following memorandum in support of his request for a time served sentence of imprisonment.

The time serviced sentence is appropriate for the following reasons: (1) the § 3553(a) factors militate in favor of a substantially reduced sentence; (2) Mr. Estrada will have additional custodial time following his criminal case as he awaits deportation to Honduras; and, (3) to reduce the increased risk of catastrophic infection of Coronavirus Disease 2019 (COVID-19) given the combination of poor heath care and confined conditions at Santa Rita Jail.

//

SECTION 3553(A) ANALYSIS

**1. The Nature and Circumstances of the Offense**

On October 2, 2019, Mr. Estrada was approached by an undercover police officer looking to buy drugs. The officer asked for $20 worth of crack. Mr. Estrada was arrested without incident shortly afterwards. When he was search he was found with 95 bindles of crack (13.9 grams gross); 21 bindles of methamphetamine (11 grams gross); and, 18 bindles of heroin (6.1 grams gross).[1]

**2. The History and Characteristics of the Defendant**

Born and raised in Honduras for most of his life, when Mr. Estrada was younger he did not always have enough food to eat. When he was growing up, he was treated differently from his other siblings. His father would say that that he was not his son and would constantly berate him. When he was nine-years-old, his mother passed away after a miscarriage. When he was 10-years-old, Mr. Estrada's father gave him to another family because he disclaimed his paternity. When Mr. Estrada tried to return home, his father would put him out again and told him to return to his new family.

Mr. Estrada's life did not improve after being placed with his "foster" family. At 10, he was expected to mind the foster family's cattle. If he did not go and do the work, they would hit him. After his birth father passed away, Mr. Estrada ran away from his foster family and hoped to reunify with his older sister. His sister was the only full sibling he had after his parents' passed away. His reunion with his sister was not a happy one. He lived with her until he was about 16-years-old, but he was encouraged to leave her home because her new husband though that he was a strain on their resources because of the number of children that they had. After he left his sister's home, he moved back into the home that his parents had left empty after their passing.

He lived there by himself at 16 until a step-brother returned and started dismantling the home to build his own. His brother took everything from the house and Mr. Estrada was left to live on the streets for four years in Honduras.

Eventually he met his common law wife when they were living in the same community in Honduras. Together they lived in a house that Mr. Estrada built with his own hands on the same plot

---

[1] As a point of comparison, a penny weights approximately 2.5 grams, so the gross amount of the drugs with the individual packaging is equivalent to approximately 13 pennies.

SENTENCING MEMORANDUM
*ESTRADA*, CR 19–546 CRB

2

of land that his parents' house once stood. They have four living children together. Two of their children died at a young age—one passed at two from illness when their house developed a leak and water came in. The other passed away at 11 after complications from diabetes. Together for 20 years, Mr. Estrada intends to return to her and his children after he is deported.

It is little wonder that in 2018, Mr. Estrada found himself atop a train slowly travelling from Honduras through Central America to Mexico and then eventually on foot to cross the border into the United States.



Image 1. Migrants arrive at a rest stop in Ixtepec, Mexico, after a 15-hour ride atop a freight train headed north toward the U.S. border on Aug. 4. Thousands of migrants ride atop the trains, known as *La Bestia,* or The Beast, during their long and perilous journey through Mexico to the U.S.[2]

Whether caused by gangs, an ineffective government, drug trafficking, or poverty, Honduras currently claims the title of "murder capital of the world."[3] The government suffers from corruption

---

[2] *John Moore/Getty Images.* Taken from Sayre, Wilson, "Riding 'The Beast' Across Mexico To The U.S. Border" Parallels (June 4, 2014). Accessed at: https://www.npr.org/sections/parallels/2014/06/05/318905712/riding-the-beast-across-mexico-to-the-us-border.

[3] United States Department of State Bureau of Diplomatic Security. Honduras 2018 Crimes and Safety Report, (April 3, 2018). Accessed at:

SENTENCING MEMORANDUM
*ESTRADA*, CR 19–546 CRB

and has lost international funding after allegations of human rights abuse.[4] There are also allegations of gang infiltration of their police force.[5] "According to the State Department, 42 percent of all cocaine headed to the U.S. and 90 percent of all cocaine flights now travel through Honduras."[6] In short, the country is hard on its citizens and harder still on people like Mr. Estrada who lack the education or money to change his place in the world.

Growing up, Mr. Estrada would work with his uncle—who worked as a mason. He left school in the third grade to work in agricultural fields near their home to provide food for his family. He made the decision to become an economic migrant and come to the United States with the hope of sending money to his family back home to supplement his own decreased earning potential as an aging mason.

He took the chance and travelled, eventually ending up Northern California. After he arrived, he initially worked doing construction and in restaurants. While he was working in construction, he was injured doing heavy lifting and developed hemorrhoids requiring surgery. After he had been out of work for 20 days some friends that he knew told him that he could make some easy money selling drugs. He agreed to do so because his physical condition otherwise prevented him from doing the manual labor he had been doing to support his family in Honduras.

**3. The Need for the Sentence Imposed To Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense; To Afford Adequate Deterrence**

The requested sentence is appropriate in light of the totality of the circumstances and, thus, reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, and serves as an adequate deterrence to criminal conduct.

**4. The Need for the Sentence Imposed To Protect the Public from Further Crimes of the Defendant; and**

Mr. Estrada will be deported following the conclusion of his sentence and it is unlikely that the

---

https://www.osac.gov/Pages/ContentReportDetails.aspx?cid=23798
[4] Khan, Carrie, "Honduras Claims Unwanted Title of World's Murder Capital" Parallels (June 12, 2013). Accessed at: https://www.npr.org/sections/parallels/2013/06/13/190683502/honduras-claimsunwanted-title-of-worlds-murder-capital.
[5] *Id.*
[6] *Id.*

SENTENCING MEMORANDUM
*ESTRADA*, CR 19–546 CRB

4

he will repeat his actions in the future. He has no significant criminal history and the public faces little risk of harm from further crimes.

**5.    The Need for the Sentence Imposed To Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner**

Mr. Estrada has a third grade education and speaks primarily Spanish—it is unlikely that any sentence that was not a lengthy one would legitimately provide him sufficient time in custody for him to acquire language skills that would permit him to attain a high school education or complete vocational training while in custody. He is presently recovering from a second hemorrhoid surgery, but has no medical issues requiring treatment.

Mr. Estrada had hemorrhoid surgery prior to being arrested for this case. When he was detained by San Francisco Police Officers they aggravated the drainage tube placed by surgeons to help him recover post-surgery as they believed that it was not a medical device but rather more drugs. It was forcibly removed without medical intervention. After he was booked into custody at Santa Rita Jail, Mr. Estrada had to have a second surgery to repair the damage done to him by the San Francisco Police Officers.

Additionally, as of March 18, 2020, the new strain of coronavirus that causes COVID-19, has infected over 215,956 people, leading to at least 8,757 deaths worldwide.[7] On March 11, the World Health Organization officially classified COVIC-19 as a pandemic.[8] Governor Newsom declared a State of Emergency and all six Bay Area counties are currently under a shelter in place order. As of March 18, 2020, there are a total of 865 positive cases and 16 deaths in California.[9] As of March 14, 2020, there are 40 of positive cases of COVID-19 in the city of San Francisco alone. These numbers are rising exponentially. With confirmed cases in San Francisco and the entire Bay Area that indicate community spread, we must take every necessary action to protect vulnerable populations and the community at large.

---

[7] As of 6:53 pm on March 18, 2020, according to the Coronavirus Resource Center as tracked by the Johns Hopkins University of Medicine. Accessed at http://coronavirus.jhu.edu.
[8] *WHO Characterizes COVID-19 as a Pandemic,* World Health Organization (March 11, 2020) *at* https://bit.ly/2W8dwpS.
[9] *See* Coronavirus Resource Center at http://coronavirus.jhu.edu.

SENTENCING MEMORANDUM
*ESTRADA*, CR 19–546 CRB

Conditions of pretrial confinement create the ideal environment for the transmission of contagious disease.[10] An opinion piece in the New York Times describes these unique and pressing issues.[11] Inmates cycle in and out of detention facilities from all over the county, and people who work in the facilities including correctional officers, and care and service providers leave and return daily, without screening. Incarcerated people generally have poorer health than the general population, and even at the best of times, medical care in custody is (at best) limited.[12] Many people who are incarcerated also have chronic conditions, like diabetes or HIV, which makes them vulnerable to severe forms of COVID-19. According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[13]

Outbreaks of the flu regularly occur in jails and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[14] In China, officials have confirmed the coronavirus spreading at a rapid pace in Chinese prisons, counting 500 cases.[15]  Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[16] Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[17] In the U.S. steps

---

[10] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *at* https://doi.org/10.1086/521910.
[11] *Our Courts and Jails Are Putting Lives at Risk*, Emily Bazelon, New York Times, March 13, 2020, available at https://www.nytimes.com/2020/03/13/opinion/coronavirus-courts-jails.html?searchResultPosition=1.
[12] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, *at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf
[13] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.
[14] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) at https://bit.ly/2TNcNZY.
[15] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020) *at* https://bit.ly/2vSzSRT.
[16] Jennifer Hansler and Kylie Atwood, *Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak*, CNN (Mar. 10, 2020) at   https://cnn.it/2W4OpV7.
[17] Claudia Lauer and Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*, The Associated Press (Mar. 7, 2020) *at* https://apnews.com/af98b0a38aaabedbcb059092db356697.

SENTENCING MEMORANDUM
*ESTRADA*, CR 19–546 CRB

are already being taken in some jurisdictions to facilitate the release of elderly and sick prisoners and to reduce jail populations by discouraging the refusing the admission of individuals arrested on non-violent misdemeanor charges.[18]

At Santa Rita jail there have been weeks of flu outbreaks, with different units being quarantined on a regular basis and yet infections continuing to spread. Inmates are in tight quarters, even more so with the closure of North County jail. Access to personal hygiene items is limited with only those inmates that have certain means able to purchase commissary (better/more soap and other hygiene items). Additionally, the jail has now restricted all visits to the jail and only allows attorney visits. No family, friends or even experts are allowed into the jail.

Santa Rita jail lacks even some basic medical care and certainly lacks the resources necessary to engage in screening and testing of inmates, correctional staff, law enforcement officers and other care and service providers who enter the facility.

As additional people are arrested who have been out in the community as the coronavirus spreads, if they are not symptomatic, they will be brought into Santa Rita jail and held with the existing population, potentially bringing COVID-19 into this population held in large numbers, close quarters, and low sanitary conditions. If COVID-19 gets into the jail, it is going to spread like wildfire. The medical care in the jail is subpar in the best of times; we can only imagine how catastrophic it will be if there is a greater stress on the system.

Put simply, in light of this pandemic there is no need for Mr. Estrada to remain in custody where he faces greater risks to his physical health.

---

[18] In New York Brooklyn District Attorney Eric Gonzalez, joined by public health experts, has asked Governor Cuomo to grant emergency clemencies to elderly and sick prisoners (Sarah Lustbader, *Coronavirus: Sentenced to COVID-19*, The Daily Appeal (Mar. 12, 2020) *at* https://theappeal.org/sentenced-to-covid-19/.); Cuyahoga County (Ohio) is holding mass pleas and bail hearings to reduce the current jail population (https://www.cleveland.com/court-justice/2020/03/cuyahoga-county-officials-will-hold-mass-plea-hearings-to-reduce-jail-population-over-coronavirus-concerns.html); Mahoning County (Ohio) jail is refusing all non-violent misdemeanor arrestees (https://www.wkbn.com/news/coronavirus/mahoning-county-jail-refusing-some-inmates-due-to-coronavirus-outbreak/); see also Collin County (TX) (https://www.dallasnews.com/news/public-health/2020/03/12/facing-coronavirus-concerns-collin-county-sheriff-asks-police-not-to-bring-petty-criminals-to-jail/);

SENTENCING MEMORANDUM
*ESTRADA*, CR 19–546 CRB

### 6. The Kind of Sentences Available

Here, the Court may impose any sentence up to 20 years' imprisonment, life-time supervised release, a $1,000,000 fine, and a $100 special assessment. A minimum term of three-years' supervised release is required.

### 7. The Sentencing Range Established for the Applicable Category of Offense Committed by the Applicable Category of Defendant as Set Forth in the Guidelines

#### A. Mr. Estrada's Proposed Guideline Calculations

```
Base Offense Level, USSG § 2D1.1(c)(14)............................................ 18
Acceptance of Responsibility, USSG § 3E1.1(a) & (b) ........................ −3

Total Offense Level ................................................................................ 15
Criminal History Category ....................................................................... I
Sentencing Guideline Range......................................................... 18-24
Mr. Estrada's Recommendation.........................time served (3 months)
```

#### B. The Court Should Adjust Downward Two Levels for Acceptance of Responsibility

Pursuant to U.S.S.G. § 3E1.1, the Court should depart three-levels because Mr. Estrada accepted responsibility for his involvement in the present offense as demonstrated by his guilty plea and his truthful admission of the conduct comprising the offense.

### 8. Any Pertinent Policy Statement

While Mr. Estrada would generally encourage the Court to not impose supervised release for individuals like Mr. Estrada who will deported after the conclusion of their sentence, he recognizes that supervision is required to be imposed as a consequence of his conviction.

### 9. Unwarranted Sentencing Disparity

While the requested sentence is a departure from the guideline range, the departure is *di minimis* when considering the conduct and the additional time Mr. Estrada will spend in immigration custody prior to his deportation. Additionally, the sentence is in accord with similarly situated defendants engaged in similar conduct swept up in the Tenderloin Drug initiative.

### 10. Restitution

There is no need for an order of restitution in this case.

//

//

CONCLUSION

The facts before the Court establish compelling reasons to impose a sentence below the guideline range—Mr. Estrada asks the Court to sentence him to a term of imprisonment of time served (approximately 3 months).

Dated:       March 18, 2020                    Respectfully submitted,

                                               STEVEN G. KALAR
                                               Federal Public Defender
                                               Northern District of California

                                                       /S
                                               CANDIS MITCHELL
                                               Assistant Federal Public Defender